UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00130-JAW-2 |
| | ) | |
| TODD SHOREY | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

An inmate serving an eighty-seven-month sentence for conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  The Court concludes that although the inmate's obesity can make it more likely he will get severely ill if he contracts COVID-19, the seriousness of his offense, the relatively short time he has served, and the need for the sentence served to fulfill the sentence imposed preclude his release.  The Court dismisses the motion without prejudice.

## I.   PROCEDURAL BACKGROUND

On April 24, 2017, Todd Shorey pleaded guilty to conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  *Min. Entry* (ECF No. 99).  On September 25, 2018, the Court sentenced Mr. Shorey to eighty-seven months imprisonment, five years supervised release, a $5,000 fine, and a $100 special assessment.  *Min. Entry* (ECF No. 150); *J.* (ECF No. 153).

On January 4, 2021, Mr. Shorey wrote a letter to the Court, requesting an attorney to assist him in filing a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  *Mot. to Appoint Counsel* (ECF No. 167).  Three days later, the

Court granted Mr. Shorey's motion and appointed counsel to represent him. *Appointment of Counsel & Scheduling Order* (ECF No. 171).

After several extensions of time, Mr. Shorey filed his motion for compassionate release on February 7, 2021. *Def.'s Pet. for Compassionate Release* (ECF No. 179) (*Def.'s Mot.*). On February 16, 2021, the Government responded in opposition. *Gov't's Opp'n to Def.'s Mot. for Compassionate Release re: First Step Act* (ECF No. 184) (*Gov't's Opp'n*). Mr. Shorey replied on February 28, 2021. *Reply to Gov't's Resp. in Opp'n to Def.'s Pet. for Compassionate Release* (ECF No. 191) (*Def.'s Reply*).

## II.   FACTUAL BACKGROUND

The Court draws much of this factual background from Mr. Shorey's Revised Presentence Investigation Report (PSR). *See Restricted U.S. Probation Filing*, Attach. 3, *PSR* (ECF No. 170). The Court adopted the PSR without change and relied on it to sentence Mr. Shorey. *Compare PSR* ¶¶ 19-29, 34, 62; *with Statement of Reasons* at 1 (ECF No. 154).

### A.   Criminal History

Prior to his federal offense, Mr. Shorey had several convictions in Maine related to operating vehicles. On April 1, 1990, at age twenty-five, Mr. Shorey was arrested for driving under the influence. *PSR* ¶ 31. He was convicted and sentenced on June 27, 1990, but according to the PSR, the sentence is "unknown." *Id.* On June 27, 2008, at age forty-four, Mr. Shorey was fined $250 plus surcharges and assessments for a rule violation related to his occupation as a commercial truck driver. *Id.* ¶ 32. Finally, on July 12, 2016, at fifty-two years old, Mr. Shorey was

fined $100 plus surcharges and assessments for failure to register his vehicle. *Id.* ¶ 33. The Probation Office (PO) assigned no criminal history points for these convictions. With a criminal history score of zero, the Court classified Mr. Shorey as Criminal History Category I. *Statement of Reasons* at 1.

### B. Offense Conduct

The investigation into the Akerson-Shorey drug trafficking conspiracy began in 2015, when the U.S. Department of Justice, Drug Enforcement Administration (DEA) started investigating the drug trafficking activities of Don Grace. *Id.* ¶ 7. At the direction of DEA agents, a confidential source (CS-1) purchased heroin from Mr. Grace on six occasions between August 28, 2015 and January 7, 2016. *Id.*

On October 29, 2015, Massachusetts State Police stopped Holly Grant for speeding. *Id.* ¶ 8. An investigation revealed Ms. Grant did not have a valid driver's license and was driving a vehicle registered to Todd Shorey. *Id.* A search of the vehicle revealed approximately three hundred grams of heroin. *Id.* According to CS-1, Ms. Grant made the trip to Connecticut for Mr. Shorey to pick up heroin and was stopped by police on her way back to Maine. *Id.*

In December 2015, DEA agents learned that Mr. Grace was making weekly trips to Connecticut to pick up approximately $15,000 worth of heroin. *Id.* ¶ 9. They believed Jamie Akerson was the leader of the drug trafficking organization, and Mr. Grace was working with Mr. Shorey and Mr. Akerson to obtain heroin from an out-of-state supplier. *Id.* DEA agents initiated electronic surveillance of Mr. Grace's cellphone and in January 2016, Maine State Police troopers stopped a vehicle with

Mr. Grace in the backseat.  *Id.*  A search of the vehicle revealed three hundred thirty grams of heroin, and Mr. Grace was arrested.  *Id.*  A review of Mr. Grace's cellphone records showed there were two hundred thirty-four contacts by a telephone subscribed to Mr. Akerson and two hundred twenty-nine contacts by two telephones subscribed to Mr. Shorey.  *Id.* ¶ 10.

On January 25, 2016, law enforcement officers went to Mr. Shorey's residence in Newport, Maine to interview him.  *Id.*  When agents approached the front door, they observed Mr. Shorey standing at the top of the stairs with a firearm in his possession but not pointed at the officers.  *Id.*  Once the officers identified themselves, Mr. Shorey dropped the weapon.  *Id.*  When questioned regarding drug trafficking activities, Mr. Shorey asked to speak with a lawyer.  *Id.*

Two confidential sources provided grand jury testimony.  A cooperating defendant (CD) stated that in August 2015, he was introduced to Mr. Shorey for the purpose of obtaining heroin and helping Mr. Shorey "move" heroin.  *Id.* ¶ 11.  After the introduction, CD started obtaining heroin from Mr. Shorey on a regular basis, initially obtaining ten or fifteen bags per day.  *Id.*  Over time, CD received more heroin from Mr. Shorey, obtaining about seven hundred or eight hundred grams of heroin.  *Id.*  CD obtained the heroin by calling Mr. Shorey and then meeting Mr. Shorey at Mr. Shorey's residence.  *Id.*  While at Mr. Shorey's house, CD met Mr. Akerson, and based on comments made by Mr. Akerson, CD understood that Mr. Shorey was dealing heroin for Mr. Akerson.  *Id.*  CD was also aware of a couple people who rode with Mr. Shorey to Connecticut for the purpose of helping Mr. Shorey transport the

heroin from Connecticut to Maine. *Id.* After Ms. Grant's arrest, Mr. Shorey stopped dealing heroin for Mr. Akerson, and shortly thereafter, CD started selling heroin for Mr. Akerson. *Id.* CD also stated that he observed firearms at Mr. Shorey's house, and Mr. Akerson indicated that the majority of those firearms belonged to Mr. Akerson. *Id.*

A second confidential source (CS-2) stated that he met Mr. Shorey in May 2015 and shortly thereafter essentially moved into Mr. Shorey's residence. *Id.* ¶ 12. While living with Mr. Shorey, CS-2 observed an individual conducting drug transactions from Mr. Shorey's residence. *Id.* Mr. Shorey introduced CS-2 to Mr. Akerson, who provided CS-2 with several bundles of heroin. *Id.* In June 2015, Mr. Akerson and Mr. Shorey purchased a vehicle used by CS-2 and Mr. Shorey to travel out-of-state to meet with an individual known as "Templer" to obtain heroin. *Id.* Between May and October 2015, CS-2 made about fifty trips with Mr. Akerson or Mr. Shorey to obtain heroin from Templer, obtaining between one hundred grams and three hundred grams, for a low-end estimate of five thousand grams of heroin. *Id.* During the trips with Mr. Shorey, CS-2 traveled in the vehicle Mr. Shorey and Mr. Akerson purchased. *Id.* After CS-2 stopped making trips to Connecticut, Mr. Shorey had Holly Grant make the trips. *Id.* CS-2 also testified that Mr. Shorey used some of the drug proceeds to buy firearms for Mr. Akerson because Mr. Akerson was unable to purchase firearms due to his felony convictions. *Id.* Mr. Akerson and Mr. Shorey shot the firearms in a lot behind Mr. Shorey's residence, and Mr. Shorey usually sat

with a handgun on the armrest of a chair in case someone tried to steal the heroin. *Id.*

The investigation revealed that from about May 1, 2015 until January 25, 2016, Mr. Shorey conspired with others to distribute one kilogram or more of heroin. *Id.* ¶ 13. Mr. Shorey obtained the heroin from an out-of-state source, packaged it in "bundles" of ten small bags containing one-tenth gram of heroin per bag, and with Mr. Akerson and others, transported the heroin to central Maine for distribution. *Id.* Mr. Akerson collected the drug proceeds and used them to purchase more heroin. *Id.* In this way, the conspiracy obtained and distributed thousands of bags of heroin per week. *Id.*

With respect to drug quantity, the PO concluded that Mr. Shorey was responsible for a total of five kilograms of heroin (100 grams x 50 trips = 5,000 grams). *Id.* ¶ 14. The PO believed this was a conservative estimate, which considered Mr. Shorey's involvement in the conspiracy ended around the time of Ms. Grant's arrest in October 2019. *Id.* To avoid potential double counting, the PO did not hold Mr. Shorey accountable for any heroin obtained during the controlled purchases. *Id.*

## C. Guideline Calculations

As a result of his criminal history and offense conduct, the Court determined that Mr. Shorey was a Criminal History Category I with a Total Offense Level of 33. *Statement of Reasons* at 1. The applicable sentencing guideline range was one hundred thirty-five to one hundred sixty-eight months imprisonment, five years of supervised release and a fine between $35,000 and $10,000,000. *Id.* The Court

departed below the guideline range and sentenced Mr. Shorey to eighty-seven months of incarceration, five years of supervised release, a $5,000 fine, and a $100 special assessment. *Id.* at 2; *J.* at 2-7.

## III.   THE PARTIES' POSITIONS

### A.   Todd Shorey's Motion

Mr. Shorey requests compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), first arguing extraordinary and compelling reasons exist to warrant his release and then claiming he is not a danger to the community. *Def.'s Mot.* at 4-7. Mr. Shorey states that he "suffers from high blood pressure" and his "Body Mass Index (BMI) is 34.6." *Id.* at 1-2. Mr. Shorey contends that his "medical conditions of high blood pressure and elevated BMI put him at increased risk for severe illness if infected with Covid," and that these conditions "meet the CDC increased risk category." *Id.* at 5-6. Furthermore, Mr. Shorey claims that "FCI Berlin is currently experiencing COVID-19 infections by its staff," inmates at the prison were previously infected, and prison conditions do not allow for social distancing. *Id.* at 6.

Mr. Shorey next argues that he is not a danger to the community. *Id.* He explains that he is "nearly 57 years old," has had only one disciplinary issue at prison, and upon release he intends to "reunite with his wife and immediate family" and return to the trucking industry. *Id.* He also acknowledges that while he has no history of drug use, a former girlfriend referred to him as a "functioning alcoholic," and he received a two-level enhancement for firearm possession. *Id.*

In conclusion, Mr. Shorey argues that he has "served about 65% of his sentence as a minimum-security inmate," is "not a danger to others," and "[u]pon release he will join his wife, family and community in Newport and restart his career in the trucking business." *Id.* at 6-7. For these reasons, he asks the Court to grant release. *Id.* at 7.

### B.     The Government's Opposition

The Government concedes that Mr. Shorey has exhausted his administrative remedies and his obesity qualifies as an "extraordinary and compelling" reason warranting release but opposes Mr. Shorey's motion because it claims Mr. Shorey "remains a danger to the public and the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against release." *Gov't's Opp'n* at 1. The Government agrees with Mr. Shorey that his obesity is "a risk factor identified by the CDC as heightening the risk of severe injury or death were he to contract COVID-19" and thus "qualifies as an 'extraordinary and compelling reason' warranting his release." *Id.* at 11. However, in making this concession, "the Government does not concede that [Mr. Shorey's] diagnosis makes it more likely that he will contract COVID-19 while in BOP custody." *Id.* at 11 n.8.

The Government next argues that Mr. Shorey should not be released because he poses a danger to the community and the § 3553(a) factors weigh against release. *Id.* at 11-12. The Government focuses on the nature and circumstances of Mr. Shorey's offense, which was a conspiracy to distribute and possess with the intent to distribute heroin, and involved firearms. *Id.* at 12. It states that "[o]ffenses

8

involving controlled substances and firearms are expressly enumerated to be considered pursuant to 18 U.S.C. § 3142(g)(1)" and his role in the conspiracy was "substantial." *Id.* ("[Mr. Shorey] arranged for out-of-state trips to procure heroin; personally went on out-of-state trips to purchase heroin; helped purchase and register a car in his own name to be used as a means of making drug runs; sold heroin directly from his home; possessed firearms of his own in connection with the drug distribution conspiracy; and used drug proceeds to purchase firearms for a prohibited felon"). While Mr. Shorey's "physical and mental condition, his family ties, his employment and financial prospects in the trucking industry, and his solid connections to the Newport area" are less concerning, the Government contends that these same factors failed to dissuade Mr. Shorey from engaging in the significant criminal conduct at issue here. *Id.* at 12-13. Furthermore, the Government questions whether Mr. Shorey "has ever meaningfully addressed his alcohol abuse" and notes Mr. Shorey "failed to comply with his conditions of release immediately prior to his sentencing, by his own admission consuming alcohol and driving away from his Probation Officer while under the influence (an illegal and dangerous act, in and of itself)." *Id.* at 13. Therefore, "consideration of the § 3142(g) factors should operate to bar [Mr. Shorey's] early release." *Id.*

The Government also argues that "the nature and circumstances of the offense and history and characteristics of the defendant," as set forth in § 3553(a)(1), similarly weigh against release. *Id.* Furthermore, the Government submits that "permitting [Mr. Shorey's] release after serving 46 months, when the Court's original

sentence of incarceration was for 87 months, would undercut 'the seriousness of the offense'" and would fail to "promote respect for the law," "provide just punishment," or "afford adequate deterrence." *Id.* at 14. Finally, the Government notes that Mr. Shorey still has an outstanding fine, which the Court should consider because Mr. Shorey has "received more than twice the amount of his fine into his trust account, yet elected not to pay such funds to the Clerk of Court." *Id.* at 15.

### C. Todd Shorey's Reply

Mr. Shorey replies to the Government's response by addressing the § 3553(a) factors and contending that he is not a danger to the community. *Def.'s Reply* at 1. Regarding the nature and circumstances of the offense, Mr. Shorey acknowledges that he committed a "serious crime involving a toxic and dangerous drug" and the "evidence indicated that [he] was armed with a firearm at times during the period of the conspiracy," but he contends the evidence also shows that a majority of the firearms belonged to Mr. Shorey's co-conspirator, and when confronted by law enforcement at his home, Mr. Shorey dropped the firearm. *Id.* at 1-2. He also claims he was an "average participant" in the conspiracy and "the conspiracy was fairly short term, running from May 2015 to January 2016." *Id.* at 2. Regarding his history and characteristics, Mr. Shorey argues that "[u]ntil the time of the offense, he had led a productive life" and was employed as a truck driver. *Id.* Furthermore, Mr. Shorey "has only a minor criminal record for an operating under the influence of an intoxicant when he was 25 years old." *Id.*

Mr. Shorey also argues that he is not a danger to the community. *Id.* at 3.  He states that until the drug conspiracy, "he had led a productive life, working at a hard job to support his family," but he acknowledges "he may have a substance use disorder with alcohol." *Id.*  He further states that while in prison he "has only incurred a minor rule violation," is currently housed in a minimum-security prison, has served 67% of his sentence, "has taken courses to improve himself including several related to running a business," and will be on supervised release upon release from prison. *Id.*  Regarding the money deposited to his inmate trust account, Mr. Shorey states that it was deposited by his wife and came from his mother, and he used the money "for commissary; clothes; health and hygiene supplies; shoes; and to pay for email and phone service." *Id.*  Finally, he asserts that his wife "suffers from Lupus, is seriously ill, and in need of his care and financial support," and that currently his mother, who lives nearby, has been helping his wife. *Id.*

## IV.   LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court addressed the legal standard for deciding a motion for compassionate release on several occasions. *See, e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set

forth in [18 U.S.C. §] 3553(a)," and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . .." 18 U.S.C. § 3582(c)(1)(A).[1]

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[2] This policy statement requires that the movant must meet the "requirements of subdivision (2)," which provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018) (U.S.S.G.).   Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial.   They include: (1) the nature and circumstances of the offense,

---

[1]    Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  But the Commission promulgated these provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228, 230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.'"  *United States v. Almeida*, Nos. 2:17-cr-52-DBH-01, 2:11-cr-127-DBH-01, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37 and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)); *see United States v. Gowdy*, 832 F. App'x 325, 327 (5th Cir. 2020) (describing whether § 1B1.13 applies to motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) (characterizing the issue as "not frivolous").

[2]    As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion."  *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1.  Similarly, Judge Hornby of this district has ruled that this policy statement "'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'"  *United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)).  The Court agrees.

specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant.  U.S.S.G. § 1B1.13 cmt. n.1.  These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons.  *Id.* § 1B1.13 cmt. n.1 (A-D).  The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  *Id.* § 1B1.13 cmt. n.2.  Finally, it states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.* § 1B1.13 cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction."  *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

## V.   DISCUSSION[3]

The Court reviewed Mr. Shorey's motion along with the Government's response and the applicable law.  The Court finds that Mr. Shorey's obesity is a condition identified by the CDC as placing him at higher risk from COVID-19. However, the Court concludes that the nature of Mr. Shorey's offense, the relatively short time he has served in relation to his eighty-seven-month sentence, and the need for the sentence imposed to deter him and others similarly situated tip the scales against release.

### A.   Extraordinary and Compelling Reasons

To grant Mr. Shorey's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence.  According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19.

Arguably, the most decisive factor is a person's age.  *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Apr. 5, 2021).  Generally, the risk of COVID-19 increases as a person ages, and over eighty percent of deaths occur in people who are sixty-five or older.  *Id.*  The age-related risk does not disappear when someone is younger than sixty-five.  *See id.* (Table entitled "Risk for COVID-19 Infection, Hospitalization, and

---

[3]      18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some compassionate release motions as untimely.  *See Crosby*, 2020 U.S. Dist. LEXIS 199085, at *17 (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *3 (D. Me. Apr. 10, 2020)).  The Government "concedes that [Mr. Shorey] has exhausted the applicable administrative process prerequisite to filing the Motion . . .."  *Gov't's Opp'n* at 1.  The Court agrees.

Death By Age Group"). Thus, even though at age fifty-six Mr. Shorey is not in the highest risk group, he is more likely than someone forty-five or younger to require hospitalization or suffer other serious complications, including death, from COVID-19. *Id.*

People with certain medical conditions may be at high risk of getting seriously ill if they contract COVID-19. The CDC guidelines list a number of medical conditions that "can make [a person] more likely to get severely ill from COVID-19." *People with Certain Med. Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Apr. 5, 2021) (*CDC COVID Med. Conditions*). By contrast, the CDC lists only one condition, pregnancy, that it says is—as opposed to can be—more likely to make a person severely ill from COVID-19. *Id.* The Court assesses Mr. Shorey's underlying medical conditions against the most recent CDC guidance.

According to the CDC, people with heart conditions can be more likely to get severely ill from COVID-19. *Id.* However, specifically for hypertension, the CDC says that high blood pressure is "possibly" a condition that can make a person more likely to get severely ill from COVID-19. From the Court's reading, the CDC compounds possibilities for hypertension, lessening its risk factor. The CDC says that hypertension is *possibly* a condition that *can* make a person severely ill from COVID-19. *Id.*

Elsewhere, the CDC states that a normal blood pressure is less than 120 systolic and less than 80 diastolic. *See Facts About Hypertension*, CDC,

https://www.cdc.gov/bloodpressure/facts.htm (last visited Apr. 5, 2021).  The CDC defines stage 2 hypertension as a blood pressure at or above 140/90 mm Hg.  *Id.*

BOP medical records from January 12, 2021 show that a doctor diagnosed Mr. Shorey with "essential (primary) hypertension."  *Def.'s Mot.*, Attach. 3, *BOP Health Services – Health Problems* (*Health Problems Summary*).  BOP medical records also show that on January 8, 2021, a doctor recorded Mr. Shorey's blood pressure at 170/90 mm Hg, putting him within the CDC's definition of "stage 2 hypertension."  *Def.'s Mot.*, Attach. 2, *BOP Health Services – Clinical Encounter (Jan. 8, 2021)*.  Thus, the Court accepts Mr. Shorey's contention that he suffers from hypertension, which according to the CDC is "possibly" a condition that "can" place him at risk of severe illness from COVID-19.

Mr. Shorey also contends that his obesity places him at a higher risk of severe illness from COVID-19.  According to the CDC, being overweight or obese can make it more likely that a person will get severely ill from COVID-19.  *CDC COVID Med. Conditions*.  The CDC notes that the "risk of severe COVID-19 illness increases sharply with elevated BMI."  *Id.*  The CDC defines "obesity" as a body mass index (BMI) of more than 30 and less than 40 kg/m$^2$ and "severe obesity" as a BMI of more than 40 kg/m$^2$.  *Id.*  The CDC defines "overweight" as a BMI more than 25 and less than 30 kg/m$^2$.  *Id.*

The Government "concedes that [Mr. Shorey] offers an 'extraordinary and compelling reason' warranting compassionate release due to his obesity."  *Gov't's Opp'n* at 10-11.  BOP records show that on January 12, 2021, a doctor recorded

Mr. Shorey's BMI as "34.0-34.9." *Health Problems Summary*. This makes Mr. Shorey "obese" under the CDC's definition and his obesity can make him more likely to get severely ill from COVID-19.[4]

The Government, however, "does not concede that [Mr. Shorey's] diagnosis makes it more likely that he will contract COVID-19 while in BOP custody." *Gov't's Opp'n* at 11 n.8. The BOP website describes FCI Berlin as a "medium security federal correctional institution with an adjacent minimum security satellite camp." *FCI Berlin*, BOP, https://www.bop.gov/locations/institutions/ber/ (last visited Apr. 5, 2021). There are 641 total inmates, with 616 at the FCI and 25 at the Camp. *Id.* In his reply, Mr. Shorey says he was transferred to the minimum-security camp at FCI Berlin. *Def.'s Reply* at 3.

The BOP has made some progress in inoculating staff and inmates at FCI Berlin, including both the medium security federal correctional institution and the minimum security satellite camp. According to the BOP, it has inoculated 104 staff members and 93 inmates, presumably in both the institution and the camp.[5] *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Apr. 5, 2021). The latest COVID-19 statistics from FCI Berlin are also encouraging. *Id.* The BOP website lists only one inmate and three staff members as having tested positive

---

[4]    Mr. Shorey has gained a substantial amount of weight while in prison. The August 15, 2017 PSR states that he was six feet tall and weighed 210 pounds. These figures result in a BMI of 28.5 in the overweight, not obese, category. Had he maintained his weight, he would be at the lower end of the CDC category of those at greater risk due to their weight. The medical record indicates that he now has a BMI between 34.0 and 34.9. According to the Court's calculation, Mr. Shorey now weighs between 251 and 257 pounds, having gained between 41 and 47 pounds since his sentencing hearing.

[5]    There is no information in this record whether Mr. Shorey has been partially or fully vaccinated, whether he declined the vaccination, or whether it has been offered to him.

for COVID-19.  *Id.*  No inmates or staff have died.  *Id.*  Twelve inmates and eight staff have recovered from COVID-19.  *Id.*

Mr. Shorey has not demonstrated that he is at a high risk of contracting COVID-19.  He is housed in a prison that has only four active cases and has an excellent track record of keeping the disease out of its facilities.  Mr. Shorey represents that he is in the camp at FCI Berlin, which houses only twenty-five inmates, presumably greatly reducing the number of people with whom he comes into contact.  Furthermore, if Mr. Shorey is fully vaccinated, the CDC says that "COVID-19 vaccines are effective at preventing COVID-19 disease, especially severe illness and death."  *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited Apr. 5, 2021).  Even if Mr. Shorey has not been fully vaccinated, the risk of his contracting a severe case of COVID-19 is less because of the ongoing vaccination program at FCI Berlin.

Nonetheless, the Court understands that the COVID-19 situation in prisons is fundamentally different than in general society, and if released, he likely would have some degree of lower risk of contracting COVID-19 than he would in prison.  In light of the Government's concession, the Court concludes that Mr. Shorey's obesity, perhaps coupled with his hypertension, may heighten his risk of complications from COVID-19.  The Court will consider whether other factors weigh in favor or against release.[6]

---

[6]      In his reply brief, Mr. Shorey also states that his "wife suffers from Lupus, is seriously ill, and in need of his care and financial support."  *Def.'s Reply* at 3.  He makes this assertion in his "danger to

### B.      Danger to the Community

Notwithstanding any extraordinary and compelling reasons for Mr. Shorey's release, the Court concludes Mr. Shorey is a danger to the community and will not release him.   The Court primarily rests this finding on two considerations.   First, Mr. Shorey's offense of conviction.   18 U.S.C. § 3142(g) instructs a court to consider "the nature and circumstances of the offense charged, including whether the offense . . . involves a . . . controlled substance [or] firearm."   Mr. Shorey's offense involved both.   Mr. Shorey was a member of a conspiracy to import and distribute heroin from out-of-state, and the Court held Mr. Shorey accountable for five thousand grams of heroin from fifty out-of-state trips.   He purchased a car for others to make heroin resupply trips and personally went on trips to purchase heroin.   He sold heroin directly from his home.

Mr. Shorey's offense also involved firearms.   He purchased firearms for a convicted felon—Jamie Akerson—and had his own firearms that he kept close by.   In fact, when law enforcement approached Mr. Shorey's residence, they observed him standing at the top of the stairs with a firearm in his possession, although the weapon

---

the community" section, so it is unclear whether he is arguing the need to care for his wife is an extraordinary and compelling reason warranting release.   Assuming he is arguing his wife's illness is an extraordinary and compelling reason, the Court is unpersuaded.   According to the U.S. Sentencing Guideline Manual, the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" is an extraordinary and compelling reason.   U.S.S.G. § 1B1.13 cmt. n.1.   However, it is Mr. Shorey's burden to prove extraordinary and compelling reasons and he has not provided any evidence of his wife's illness or that he is the only one who can care for her.   In fact, Mr. Shorey states that "his mother, who lives nearby, has been helping with her financial needs."   *Def.'s Reply* at 3.   While the Court sympathizes with Mr. Shorey's concerns about his wife's well-being, Mr. Shorey has not shown why the situation is so urgent as to merit releasing him.   *See United States v. Nuñez*, No. 1:11-cr-00205-JAW-06, 2021 U.S. Dist. LEXIS 28500, at *26-28 (D. Me. Feb 16, 2021) (undertaking a similar analysis).

was not pointed at the officers and Mr. Shorey subsequently dropped the weapon. There is no evidence that Mr. Shorey used the firearms, but this combination of drugs and guns is a recipe for disaster.

At Mr. Shorey's sentencing hearing, the Court informed Mr. Shorey that it found very little to recommend him. In his fifties, he had cynically chosen to become involved in trafficking in heroin because he thought he could make money, undeterred by the fact that trafficking in heroin is not only illegal but causes enormous harm to the people in his community. There was no sign that Mr. Shorey was addicted to the drugs he was trafficking; instead, his motive was purely one of greed. Mr. Shorey's mindset in viewing the trafficking in heroin as a business opportunity bothered the Court at his sentencing and bothers the Court now. His purely financial motivation in committing this federal crime revealed not only a disregard for the law but a moral blind-spot that worries the Court about his prospects on release if some other financially enticing but morally and legally bankrupt prospect were to become available to him.

The Court is also concerned by Mr. Shorey's drinking problem. Citing his PSR, Mr. Shorey admits that he "may have a substance use disorder with alcohol." *Def.'s Reply* at 3. The PSR reveals that prior to his arrest for the instant offense, he consumed between ten and twelve beers four to five times a week but "does not believe he needs treatment as his alcohol consumption is not problematic." *PSR* ¶ 49. Mr. Shorey's alcohol abuse has caused him problems in the past. While not counted

for purposes of his criminal history calculation, he has a past DUI conviction.  *Id.* ¶ 31.

On April 21, 2017, while Mr. Shorey was out on bail and just before he entered his guilty plea, Magistrate Judge Nivison revoked Mr. Shorey's bail after he violated his bail conditions in an egregious manner.  *Order on Mot. to Revoke Conditions of Release* (ECF No. 96) (*Order Revoking Bail*).  In that incident, on April 19, 2017, Mr. Shorey reported to the U.S. Probation Office in Bangor, Maine and submitted a breath sample that revealed a BAC of .132%.  *Ex Parte Mot. for Issuance of Arrest Warrant, for Revocation of Order Setting Conditions of Release, and for an Order Directing the Def.'s Detention*, Attach. 1, *USPO Internal Mem.* at 1 (ECF No. 89).  He admitted to drinking five beers and a shot of alcohol earlier that day.  *Id.*  He also admitted that he drove himself to the Probation Office, thus operating a motor vehicle after consuming a substantial amount of alcohol.  *Id.*

Mr. Shorey was instructed by his probation officer to wait in the lobby during a break in the meeting; instead, he left the Probation Office and the security guards observed him leaving the area in his vehicle.  *Id.* at 2.  Because of Mr. Shorey's failure to comply with bail conditions and "concerns for the safety of the community as demonstrated by [Mr. Shorey's] operation of a motor vehicle while under the influence of intoxicants," Magistrate Judge Nivison found that "there are no conditions upon which [Mr. Shorey] can be released that would reasonably assure [his] appearance as required and the safety of the community."  *Order Revoking Bail* at 1-2.  Without any

showing that Mr. Shorey has addressed his alcohol abuse, the Court remains concerned about the safety of the community.

Mr. Shorey asserts that while in prison he has incurred only "a minor rule violation" and he has "taken courses to improve himself including several related to running a business." *Def.'s Reply* at 3.  The Court encourages Mr. Shorey to continue his efforts at rehabilitation.  However, at this time, Mr. Shorey affords the Court no grounds on which the Court may conclude that releasing him would not jeopardize the public safety.  Thus, the Court concludes that Mr. Shorey is a danger to the community and releasing him would contravene 18 U.S.C. § 3142(g).

### C.   The Section 3553(a) Factors

Finally, the Court must consider the factors set forth in 18 U.S.C. § 3553(a).  The Court concludes those factors weigh against release.  The Court has given particular weight to the serious nature and aggravating circumstances of Mr. Shorey's offense.  The Court will not repeat its description of the offense conduct but concludes that the importation of enormous amounts of heroin from out-of-state and the role of firearms in the offense do not support early release.  Furthermore, the sentence must afford adequate deterrence.  This includes both specific deterrence—that is, the need for Mr. Shorey to serve a sentence long enough to deter his own criminal conduct—as well as general deterrence, the need to deter others.  Particularly in instances like this, where the defendant is involved in a drug trafficking conspiracy, a substantial sentence is necessary to reflect the seriousness of the offense and prevent others from engaging in similar criminal conduct.

When the Court sentenced Mr. Shorey over two years ago it imposed a sentence that was "sufficient but no greater than necessary" and departed significantly below the guideline range. The Court reviewed its prior determination and reaffirms it in full. The Court received no new information that would alter its reasoning at the time of his sentencing hearing. The Court only adds that Mr. Shorey has served just 55% of his statutory term and 64% of his full term of imprisonment. Release at this point would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

### D.     Summary

Mr. Shorey has not carried his burden of proving entitlement to compassionate release. While his obesity can increase the risk of serious complications from COVID-19, given the nature and circumstances of his offense, releasing Mr. Shorey early would endanger the community and contravene the § 3553(a) factors. The Court wishes Mr. Shorey the best and fully expects that he will return to society a productive and law-abiding citizen. On the record before the Court, however, he does not qualify for compassionate release under 18 U.S.C. § 3582(c).

## VI.   CONCLUSION

The Court DISMISSES without prejudice Todd Shorey's Petition for Compassionate Release (ECF No. 179).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of April, 2021